# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

**DIVERSIFIED EDUCATIONAL**
**TRAINING AND MANUFACTURING**
**COMPANY, INC., a/k/a "DETAMC",**

        **Plaintiff,**

**v.**                                   **Case No. 05-02408-JWL**

**THE CITY OF WICHITA**
**AND ITS REPRESENTATIVES,**

        **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Diversified Educational Training and Manufacturing Company, Inc. ("DETAMC"), a privately owned Kansas corporation which provides manufacturing and educational training services, is owned and operated by Pam and George Johnson, who are both African-American.  DETAMC brings this action alleging that defendant City of Wichita ("the City") racially discriminated against it in violation of 42 U.S.C. § 1981, through 42 U.S.C. § 1983.  DETAMC also asserts a state breach of contract claim against the City.  This matter is currently before the court on the City's motion for summary judgment (doc. 23) and DETAMC's cross motion for partial summary judgment (doc. 31).  For the reasons explained below, those motions are denied, except as to plaintiff's claim for damages for humiliation and mental and

physical pain and suffering, as to which judgment as a matter of law is granted.[1]

## I.   Statement of Material Facts[2]

During all times relevant to this case, Sarah Gilbert[3] served as the head of the City's Career Development Office (CDO).  Cathy Holdeman served as the Assistant City Manager and Chris Cherches served as the City Manager.  According to Ms. Gilbert, she reported directly to Ms. Holdeman, who in turn reported to Mr. Cherches, who in turn reported to the Wichita City Council.

The Workforce Investment Act[4] (WIA) became effective in Kansas on July 1, 2000.[5]  In

---

[1]DETAMC has also made a motion for oral argument in this case. Because the court, in its discretion under District of Kansas Local Rule 7.2, concludes that oral argument is unnecessary, that motion is denied.  Moreover, the City's request for the court to decline supplemental jurisdiction over plaintiff's state law claims is moot in light of the court's denial of summary judgment on the § 1981 claim.

[2]Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to DETAMC, the nonmoving party.

[3]DETAMC has objected to Ms. Gilbert's affidavit (doc. 23-1) in this case as being a sham affidavit.  The court did not refer to Ms. Gilbert's affidavit in developing its statement of material facts and therefore finds DETAMC's objection moot.

[4] 29 U.S.C. §§ 2801 - 2945 (2006).

[5] The purpose of the WIA is to:

provide workforce investment activities, through statewide and local workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation.

the summer of 2000, the City entered into a five year local plan pursuant to the WIA for a six county area in south central Kansas, called Service Delivery Area IV (SDA IV).[6]  The operator of that plan was a consortium of the City, the SDA IV office of Kansas Department of Human Resources, (SDA IV), Butler County Community College, and Cowley County Community College.  The City was responsible for the disbursement of grant funds for SDA IV.

The City's Career Development Office (CDO) provided guidance and support for educational and training program opportunities for qualifying citizens who sought to enhance their skills.  The CDO also managed the state and federal funds allocated to the City pursuant to the local and state plans under the WIA. The City entered into various contracts, called training agreements, with "intensive service providers"[7] in the greater Wichita area, which were: Butler County Community College (BCCC), Cowley County Community College (CCCC), DETAMC, Kansas School for Effective Learning, Inc. (KANSEL), and Wichita Area Technical College (WATC).[8]  Pursuant to these contracts, the service provider agreed to provide certain

29 U.S.C. § 2811.

[6]In its briefing in this case, DETAMC has objected to the admission of a document outlining the policies and procedures of the SDA IV; the court finds DETAMC's objection moot for the purpose of ruling on this motion because that document is not in the summary judgment record.

[7]According to Ms. Gilbert, "intensive service provider" is a term of art under the WIA and refers to a provider who offers basic remedial skills regarding GED preparation, high school diploma completion, and other basic skills necessary to prepare individuals for more advanced vocational training.  *See* 29 U.S.C. 2864(d)(3) (describing intensive services under the WIA).

[8]CCCC, BCCC, and WATC are all public institutions of higher education, governed by the Kansas Board of Regents.  KANSEL is a non-profit member organization of the United Way. DETAMC is a privately owned corporation.

educational services to individual students.  The City would pay the students' tuition for those services, utilizing funds received pursuant to the local and state WIA plans.

According to Ms. Gilbert, the relationship between the City and the service providers functioned as follows.  The City maintained a list of "intensive service providers." An individual would apply to the CDO for career services.  After the individual's WIA eligibility was determined, the city employment specialist (a member of the CDO staff) would assess the individual's skills, interests, abilities, occupational goals, family needs, and any barriers to employment.  At that point, the specialist and the individual would consult the list of providers and agree on the best plan and provider for the individual's specific needs.  Once a provider was chosen, a training agreement was executed between the City and the service provider.  Those agreements contained no specific performance standards and only required that the providers "provide the trainee with the job specific skills and competencies necessary to meet local employers' entry-level qualifications . . . or to meet the requirements for a GED, or to meet other training goals as specified . . . ."  Ms. Gilbert had authority to execute the training agreements on behalf of the City.

In February of 2002, Ms. Gilbert, Ms. Holdeman, Mr. Johnson, and Mrs. Johnson had a meeting in which DETAMC decided to begin offering a program which would provide GED preparation and training in the basic skills necessary to enter an occupational training program.[9]

---

[9]DETAMC had previously been providing occupational training services to the City pursuant to the WIA plans, but was unable to meet the minimum requirements applicable for occupational training providers.

After that meeting, DETAMC submitted an outline to the City, describing the curriculum, program, how the program would be operated and the tuition rates. By providing GED and basic skill services, DETAMC became qualified as an intensive service provider under the WIA and thus was placed on the City's list of those providers.

Ms. Gilbert testified in her deposition that at the February 2002 meeting, she informed DETAMC that the individuals provided through the City pursuant to the WIA plan could not be DETAMC's only source of students because the City could not guarantee a specific number of students at any given time. Ms. Gilbert stated that she encouraged DETAMC to investigate other sources of students and marketing methods. Ms. Gilbert explained that she gave this advice to DETAMC out of concern for DETAMC's viability if they only relied on the City for students.

In April of 2002, the first session of training began at DETAMC and seven students were enrolled. Six of those students dropped out shortly after the session began. At this time, according to Ms. Gilbert, Ms. Johnson expressed her concern over the number and type of students that were coming to DETAMC. In order to remedy this situation, an exception was made for DETAMC to attempt to increase its number of enrollees.[10]  DETAMC was permitted to conduct its own recruitment and orientation. Any interested students would be sent to the City to determine whether they met the eligibility requirements of the WIA plan. Once that was determined, the student would be sent back to DETAMC for training. This change was not made

---

[10]Ms. Gilbert testified at her deposition that because Mr. Johnson was on the Local Workforce Investment Board, which governed the WIA, the City felt some pressure from other board members to make sure that the situation with DETAMC was successful by finding a way to fill the classes at DETAMC.

regarding the City's relationship with any of the other intensive service providers.

Beginning in late May of 2002, the City requested that DETAMC submit weekly attendance reports.  The training agreements provided for monthly attendance reports, not weekly attendance reports.  No other service providers were required to provide weekly attendance reports.

In August of 2002, the City decided to honor the training agreements it had with DETAMC regarding existing students recruited by DETAMC, but determined it would not participate in any more DETAMC orientations or take on any new lists of students from DETAMC.  According to Ms. Gilbert, this decision was made due to concerns regarding the attendance and drop-out rate of the DETAMC program.[11]  Ms. Gilbert testified that the drop rate of DETAMC was tracked, but that the drop rates of no other intensive service providers were tracked.[12]  Ms. Gilbert was concerned about attendance because if students were not going to class, they were not improving their basic skills or their GED preparation.

Ms. Gilbert testified that her office is accountable for the entire WIA local program and had to ensure that certain performance standards were met.  Therefore, Ms. Gilbert stated, she was concerned that the deficiencies of the DETAMC program would affect the overall performance of the local plan as a whole.  Ms. Gilbert also testified that the City was not

---

[11]Ms. Gilbert testified that the City became aware of attendance problems with the DETAMC program through the weekly attendance reports sent by DETAMC and through contact with the individual students enrolled in the DETAMC program.

[12]Ms. Gilbert stated that she did not track those drop rates because the numbers were so small in the other intensive provider programs.

experiencing these problems with any of the other providers.  There is no evidence in the record indicating the exact specifications of these performance standards.[13]  Furthermore, there is no evidence indicating how these performance standards apply, if at all, to WIA.  There is also no evidence indicating the performance rates of the other intensive service providers.

Ms. Gilbert expressed her concerns to Ms. Holdeman. Ms. Holdeman then advised Ms. Gilbert to seek a review of DETAMC's performance by the City's internal auditor, Karen Walker.[14]  Ms. Walker then proceeded to conduct an audit of DETAMC.  Ms. Gilbert testified that no other intensive training programs were audited.

In November of 2002, Mr. Cherches sent an email to the Wichita City Council informing him of the City's concerns with the DETAMC program and advising them that he had authorized an audit of DETAMC.  Also in November of 2002, Ms. Gilbert sent an email to Ms. Holdeman indicating that she would inform Ms. Johnson that, based on advice from the internal auditor, enrollment in DETAMC programs by the City would be stopped pending a year end review of expenditures.

In mid-December, 2002, Mr. Cherches sent an email to the mayor, Bob Knight, and others indicating that the audit of DETAMC was completed and that DETAMC had not complied with

---

[13]Ms. Gilbert provides some conclusory testimony on this subject, but, taken in the light most favorable to the plaintiff as the nonmoving party, that testimony is insufficient to establish the existence or applicability of these standards as a matter of law.

[14]Ms. Gilbert testified at her deposition that the audit process began in late August of 2002. However, an email exchange between Ms. Gilbert and Ms. Holdeman indicates that the audit was recommended in late October of 2002.  Although the exact date is unclear, the court concludes the auditing process began sometime in the fall of 2002.

the terms and conditions of the funding provided by the City. The email did not state what those terms and conditions were.  On January 17, 2003, Mr. Cherches sent a fax to Kansas State Senator Rip Gooch regarding the status of the City's relationship with DETAMC.  He indicated to Senator Gooch that the WIA has an overall performance requirement of 71%.[15]  He went on to state that DETAMC's performance was 5% and thus violated the terms and conditions of the contract; however, the training agreements did not include a required performance percentage. Ms. Johnson testified at her deposition that the City stopped paying  DETAMC pursuant to existing training agreements in January or February of 2003.

In May of 2003, DETAMC was provided with the final results of the City's audit of DETAMC's contractual performance, which was conducted by Ms. Walker.  The audit states that DETAMC failed to meet the training agreement requirements of providing the students with "job readiness, specific skills, or competencies to complete the courses necessary for job readiness and GED training."  The audit further stated that the City was seeking a recovery of $64,688 for tuition reimbursement and refund regarding GED books.  The audit stated that "the overall Workforce Investment Act performance requirement goals are a 71% successful completion rate."  The auditor further opined that only 14.1% of the students successfully complete the DETAMC program.  This opinion was based on each student "completing at least 72% full-day attendance with a minimum overall attendance of 87% attendance."

According to Ms. Gilbert, Mr. Cherches was the party responsible for terminating the

[15]The court notes that this memo contained no evidence regarding how this 71% completion rate applied to DETAMC.

8

training agreements. The exact date of cancellation is not clear from the record; however, according to Ms. Gilbert, in April of 2003, the City's decision of whether to cancel the agreements was still pending completion of the audit.

DETAMC brought this action in September of 2005, under 42 U.S.C. § 1981, alleging that the City had racially discriminated against it, thus violating its right to make and enforce contracts under § 1981 and in the Final Pretrial Order in this case clarified that it is seeking the remedies provided in 42 U.S.C. § 1983. DETAMC also alleges a state breach of contract claim against the City. DETAMC seeks damages for (1) breach of contract; (2) humiliation and mental and physical pain and suffering; (3) economic damages due to discrimination; and (4) attorney's fees. Ms. Johnson testified at her deposition that the mental and physical pain was suffered by her and her husband.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient

evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U .S. 574, 587 (1986)); see also *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams*, 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.  Analysis

### A.    Final Policy Maker

DETAMC brings its § 1981 claim through § 1983 directly against the City.  A municipality is liable under § 1983 only if it takes "action pursuant to official municipal policy of some nature [that] caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).[16]  The Supreme Court has found, however, that "municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).[17]  But "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id*. at 481.  If, however, the particular official has only discretion in the exercise of the particular function in question, the exercise of that discretion alone is not enough to impose municipal liability.  *Id*. at 482 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-24 (1985).  "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable."  *Id*. at 482-83.

---

[16]The City asserts and DETAMC concedes that municipalities may not be subjected to *respondeat superior* liability under § 1983; the court agrees.  *See Monell*, 436 U.S. at 694.

[17]Municipal liability may also be imposed if an official custom or practice that may be said to represent official policy caused a violation of DETAMC's constitutional rights.  *Monell*, 436 U.S. at 694.  This issue is not currently before the court, however, and it will not be considered.

In this case, DETAMC's allegations pertain to actions taken by the City through its employees, Ms. Gilbert and Mr. Cherches.  To determine whether Ms. Gilbert or Mr. Cherches is a final policy maker for the City, the court must look to state law and local ordinances.  *See Pembauer*, 475 U.S. at 483; *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1189 (10th Cir. 2003). The Tenth Circuit has enumerated three elements to consider when determining if an official is a final policy maker: (1) whether the official is meaningfully constrained by policies formulated by others; (2) whether the official's decisions are final or whether they are subject to meaningful review; and (3) whether the policy decision allegedly made by the official is within his or her grant of authority.  *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995). In *Randle*, the Circuit emphasized that any review constraints must be "*meaningful*–as opposed to merely hypothetical–in order to strip an official of 'final policymaking' authority." *Id*. at 449 (emphasis in original)

The defendant argues that municipal liability may not be imposed based on Ms. Gilbert's actions because she was not vested with final policy making authority regarding the authorization of the audit and termination of the City's training agreements with DETAMC. DETAMC contends that Ms. Gilbert was a final policy maker with respect to those activities. The court agrees with the City.

Ms. Gilbert served as the Career Development Director for the City.  Ms. Gilbert testified at her deposition that she had the discretion to execute training agreements such as the ones entered into with DETAMC.  However, Ms. Gilbert further testified that all of her actions were

reviewable by the assistant city manager and the city manager.  She reported directly to Ms. Holdeman, the assistant city manager, who in turn reported directly to Mr. Cherches, the city manager.  Ms. Gilbert recommended the audit of DETAMC but she testified that the audit had to be authorized by Mr. Cherches to be executed. Furthermore, an email from Mr. Cherches to the city council indicates that he authorized the audit.  Ms. Gilbert also testified that Mr. Cherches would have been the one ultimately authorized to terminate the City's contracts with DETAMC and DETAMC has presented no evidence to the contrary.

Based on these facts, it is clear to the court that Ms. Gilbert's did not make the final decision to administer the audit or to terminate the contracts with DETAMC.  Her actions were reviewable by others with policy-making authority and were constrained by the policies of others. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Therefore, the court concludes that there is no genuine issue of material fact as to whether Ms. Gilbert was a final policy maker.  Accordingly, the court finds that her actions are not enough to impose municipal liability on the City.  *See Pembaur*, 475 U.S. 482 ("Municipal liability only attaches where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.").

The City relies on provisions of the Code of the City of Wichita, Kansas which explicitly prohibit the city manager from setting city policy in arguing that Mr. Cherches did not possess final policy making authority.[18]  However, an application of the three elements from *Randle* to

---

[18]Section 2.04.110 of the Code of the City of Wichita, Kansas reads as follows:

the facts of this case support the conclusion that there is a genuine dispute as to whether Mr. Cherches, as City manager, was a final policy maker with respect to the authorization of the audit and the termination of the DETMAC contracts.

The first two considerations are whether Mr. Cherches actions were meaningfully constrained by policies formulated by others and whether Mr. Cherches' decisions were final or whether they were subject to meaningful review. *Randle*, 69 F.3d at 448. Although the city ordinance explicitly prohibits the city manager from establishing policy, the City has presented no evidence indicating any policy of the city council or statutory requirements which would "meaningfully constrain" Mr. Cherches in authorizing the audit or terminating the contract, such as evidence that those actions were reviewable by the city council. Furthermore, there is no evidence before the court to suggest that Mr. Cherches' decisions actually were reviewed by the city council or any other decisionmaker in this case. For these reasons, the court finds that the City has failed to show that it is entitled to judgment as a matter of law on this issue because a genuine dispute exists as to whether Mr. Cherches was a final official policymaker with respect to the authorizing of the audit and the termination of DETAMC's contracts. *See Randle*, 69 F.3d at 449-50 (finding genuine dispute of material fact based on absence in record of meaningful constraint or review of city manager's personnel decisions).

---

The city manager shall act as the administrative head of the city and in such capacity shall direct the affairs of the city within the limits of the budget, the policies established by the city council and the requirements of the statutes . . . He shall have no vote in the public meetings of the governing body and shall refrain from attempting to establish policy except as he shall make recommendations to the city council as a whole.

14

B.      *Constitutional Violation*

Even if the court assumes that Mr. Cherches was a final policy maker with respect to the actions in this case, its analysis does not end there.  DETAMC originally brought this claim pursuant to 42 U.S.C. § 1981; however, this court has held that § 1983 provides the exclusive remedy for pursuing damages against a state official for claims arising under § 1981.  *Sims v. Unified Gov't of Wyandotte County*, 120 F. Supp. 2d 938, 953 (D. Kan. 2000).  Thus, DETAMC was permitted to clarify in the pretrial order that it pursues its § 1981 claim via the remedies provided under § 1983.  To establish § 1983 municipal liability, DETAMC must also prove that the City's actions constituted a violation of DETAMC's federal rights.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)("proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the City is responsible for that violation.").  Therefore, the court must determine whether the plaintiff has come forth with sufficient evidence for a reasonable trier of fact to conclude that the City discriminated against DETAMC in violation of its federal rights under § 1981.

DETAMC has not presented direct evidence that the City intentionally discriminated against it in ordering the audit and eventually terminating the contracts with DETAMC.[19]  Therefore, for purposes of summary judgment, the court concludes that DETAMC's § 1981

---

[19]A "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination.'"  *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000) (citations omitted). DETAMC has not come forward with any such policy.

discrimination claim should be analyzed under the burden-shifting framework developed under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225-26 (10th Cir. 2000) (*McDonnell Douglas* applied to section 1981 employment discrimination claim); *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 385 (3d Cir.1999) (*McDonnell Douglas* applied to section 1981 discrimination in contracting claim); *Jackson v. Montgomery*, 999 F.2d 547, 1993 WL 261876, at *2 (10th Cir. 1993); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir.1991) (same); *see also Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir. 1989) (*McDonnell Douglas* applied to section 1982 claim for alleged discrimination in housing).

Pursuant to this framework, DETAMC initially must make a prima facie case of discrimination. *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). Once DETAMC has established its prima facie case, the burden shifts to the City to offer a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-03; *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317-19 (10th Cir. 1992)). If the City comes forward with a nondiscriminatory reason for its actions, the burden then reverts to DETAMC to show that the proffered reasons are pretextual, or unworthy of belief. *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994)). This framework provides the governing law for determining what facts are material for summary judgment purposes.

1.    DETAMC's Prima Facie Case of Discrimination[20]

_____

[20]The Tenth Circuit has found that, in the employment context, the same standards apply to determine the prima facie case, regardless of whether the claim is brought pursuant to Title VII, §

The Tenth Circuit has held that, in order to establish a prima facie case, an employee alleging wrongful termination on the basis of race must show that: "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).[21]  It is undisputed that DETAMC was owned by Mr. and Mr. Johnson, who are African-American and therefore members of a protected class. The fact that DETAMC alleges that it was performing satisfactorily under the contracts is sufficient to satisfy the second element of its prima facie case. *See Mattera v. Gambro, Inc.*, 94 Fed. Appx. 725, 2004 WL 723239, at *3 (10th Cir. April 5, 2004)(citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1166 n.3 (10th Cir. 1998).

As for the final element of its prima facie case, DETAMC's burden is slight.  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005)("To satisfy her *de minimus* prima facie burden, [the plaintiff] only needed to demonstrate that her termination occurred 'under circumstances which give rise to an inference of discrimination.'")(quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000)).   The  Tenth Circuit has enumerated a variety of circumstances which can give rise to an inference of discriminatory motive, including "actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus . . . ,

---

1981, or § 1983.  *See Kendrick v. Penske Transp. Svcs. Inc.*, 220 F.3d 1220, 1225 n.4 (10th Cir. 2000). Accordingly, the court has considered all relevant Title VII, § 1983, and § 1981 cases decided by the Tenth Circuit. in evaluating DETAMC's prima facie case.

[21]The court finds that cases involving employee's alleging wrongful termination on the basis of race are analogous to DETAMC's situation here.

preferential treatment given to employees outside the protected class . . ., or, more generally, upon the timing or sequence of events leading to plaintiff's termination." *Plotke*, 405 F.3d at 1101 (quoting *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996).

There is no indication in the record of any actions or remarks by either Mr. Cherches, Ms. Gilbert, or any other city employee that could be viewed as reflecting a discriminatory animus. However, DETAMC has argued that it was treated differently and subjected to different standards than the other intensive service providers. This is similar to the circumstance of preferential treatment being given to employees outside the protected class in the wrongful employment termination context described in *Plotke*. As will be discussed more thoroughly in the court's analysis of pretext, it is uncontroverted that DETAMC was required to submit weekly attendance reports and was audited and that no other intensive service provider was subjected to these requirements. It has also come forward with evidence that it was held to standards to which no other intensive service provider was held. Taking all inferences from these facts in the light most favorable to plaintiff, the court concludes DETAMC has made the de minimus showing required for a prima facie case of race discrimination.

2.     The City's Reasons for Terminating the Contracts

Because DETAMC has established a prima facie case for purposes of the City's motion for summary judgment, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for terminating the contracts with DETAMC. According to the City, it recommended the audit of DETAMC and eventually terminated the contracts with DETAMC because the

participants in DETAMC's training programs failed to meet the performance obligations established under the WIA local program.  The City contends that DETAMC's failure to meet the performance requirements of the WIA program jeopardized the program funding for all participants in the local program.  The court finds this proffered reason is sufficient to meet the City's burden.  Thus, the burden shifts back to DETAMC to demonstrate that the City's proffered reason is pretext.  *See Antonia v. The Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).

3.    DETAMC's Showing of Pretext

    To show that the City's proffered nondiscriminatory reason for terminating the contracts with DETAMC is pretextual, "[DETAMC] must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the City's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [the City] did not act for the asserted non-discriminatory reasons."  *See id.* at 1183 (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006)).  The Tenth Circuit has held that pretext may be shown through evidence that a plaintiff was treated differently from other similarly-situated employees.  *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1175 (10th Cir. 2006)(citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

    DETAMC's pretext argument asserts that the City treated it less favorably than the other intensive service providers, specifically that it was required to submit weekly attendance reports,

was held to higher standards, and was audited.  It is uncontroverted that the City took these actions with respect to DETAMC but not the other intensive service providers.  DETAMC argues it was similarly situated to these providers because all providers were subject to the same contract terms in the training agreements.  Moreover, the city has not provided evidence that DETAMC was not "similarly situated" to the other intensive service providers.

The City's justification for its treatment of DETAMC is that the City was required to meet overall performance standards pursuant to the WIA local plan which DETAMC failed to fulfill. However, although the City has alleged these standards, it has not presented uncontroverted evidence demonstrating what exactly these standards were or that the alleged standards were specifically applicable to DETAMC.  Furthermore, the City has not provided evidence indicating that the other providers were meeting the alleged standards but that DETAMC was not as justification for treating DETAMC differently from other intensive service providers. Accordingly, the court finds that the City has failed to meet its burden of establishing that there is no genuine issue of material fact as to what the performance standards were, that DETAMC was subject to the standards, and that DETAMC failed to meet the standards.  Therefore, the court concludes a genuine dispute remains as to whether the City's reasons for the actions it took respecting DETAMC were pretextual.

C.    *DETAMC's Cross Motion for Partial Summary Judgment*

DETAMC's cross motion for partial summary judgment alleges that no reasonable jury could determine that the City *did not* discriminate against DETAMC.  Although the court has

determined there is a genuine dispute respecting the performance standards in this case and whether they applied to DETAMC, DETAMC has not shown the absence of a genuine issue of material fact that the City discriminated against DETAMC.  The City has alleged that six of the initial seven enrollees in DETAMC's program dropped out; DETAMC has not disputed this fact. Moreover, a reasonable trier of fact could find that plaintiff was subject to and failed to meet certain performance standards, which led to the actions being taken against DETAMC which it challenges here.  Accordingly, there is clearly no basis for concluding that no reasonable trier of fact could find the City did not discriminate against DETAMC.  Accordingly, DETAMC's cross motion is denied.

D.      Limitation of Damages

       The City argues that, even if it is not entitled to summary judgment, DETAMC is not entitled to damages for humiliation or mental and physical pain and suffering because it is a corporation, rather than an individual.  DETAMC argues that it is entitled to damages for the pain and suffering of Mr. and Mrs. Johnson.  DETAMC further alleges that had the City raised this argument earlier, DETAMC would have sought to amend its complaint or the pretrial order to add Mr. and Mrs. Johnson as plaintiffs.  Regardless of the timeliness of the City's argument, the court concludes that DETAMC's discrimination claim entitles neither DETAMC nor Mr. and Mrs. Johnson to damages for pain and suffering.

       Having found no authority directly on point regarding a corporation's ability to recover damages for pain and suffering, the court finds the Tenth Circuit's opinion in *Guides, LTD. V.*

*Yarmouth Group*, 295 F.3d 1065 (10th Cir. 2002) persuasive.  In *Guides*, Africa House, a retail mall tenant, and Tseghe Foote, Africa House's sole shareholder, alleged that the landlord and mall management company discriminated against them, thus unlawfully interfering with their right to make and enforce a contract under § 1981.  *Id*. at 1071.  A jury found in favor of and awarded damages to both Ms. Foote and Africa House.  *Id*.  The Tenth Circuit affirmed the district court's decision to dismiss Ms. Foote as a plaintiff for lack of standing and to set aside the verdict and damages in her favor.  *Id*. at 1073.

The Circuit first noted the general rule that a stockholder cannot maintain a personal action against a third party for harm caused to the corporation, unless the third party's actions caused injury unique to the shareholder.  *Id*. at 1072. (citing *Stat-Tech Intern. Corp. v. Delutes*, 47 F.3d 1054, 1060 (10th Cir. 1995).  The Circuit went on to find that because Ms. Foote's alleged emotional distress arose from the failure of the defendants to contract with Africa House, that distress was derivative of Africa House's claim and thus Ms. Foote lacked standing to sue on her own behalf.  *Id*. at 1072-73.

The Circuit also examined the jury award of damages in *Guides*.  The district court had instructed the jury that in determining compensatory damages, it could consider (1) financial losses, including lost profits and expenses, and (2) loss of good name, reputation, honor, or integrity.  *Id*. at 1076.  The Circuit found that expert testimony was sufficient to support damages for lost profits.  However, the Circuit found that damages awarded beyond lost profits was not supported by the evidence because no evidence of loss of good name, reputation, honor or

22

integrity was presented.  *Id*.

In this case, similar to *Guides*, DETAMC was the party to the contracts with the City, not Mr. and Mrs. Johnson.  Thus, "the direct victim of the alleged discrimination" was DETAMC rather than Mr. and Mrs. Johnson themselves.  *See id*. at 1072.  The pain and suffering complained of by Mr. and Mrs. Johnson refers to their personal humiliation and physical and mental pain, not humiliation and pain suffered by DETAMC.  As in *Guides*, however, the court concludes that this distress arose from the City's alleged termination of its contracts with DETAMC, and thus is derivative of DETAMC's claim.  *See id*. at 1072-73.  Accordingly, the court finds that even if the City had raised this argument earlier, Mr. and Mrs. Johnson would have lacked standing to sue on their own behalf.  *See id*.

Although the Circuit did not specifically mention whether Africa House could recover damages for emotional distress, it concluded that any damages for emotional distress were personal to Ms. Foote and were derivative of the economic damages suffered by Africa House.  *See id*. at 1072.  Based on this finding, combined with the Circuit's discussion of what damages Africa House was entitled to, the court concludes that *Guide*s supports the conclusion that DETAMC cannot recover damages for Mr. and Mrs. Johnson's alleged humiliation and pain and suffering because those damages are personal to Mr. and Mrs. Johnson, who have no standing to assert claims under § 1981 in this case.  DETAMC may, however, be able to recover economic damages for its financial losses, lost profits, or loss of reputation, good will, honor, or integrity.

23

**IT IS ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 23) is granted in part and denied in part as set forth above.  Plaintiff's cross motion for partial summary judgment (doc. 31) and motion for oral argument (doc. 36) are denied as well.

**IT IS SO ORDERED.**

Dated this 9th  day of February 2007, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United Stated District Judge